**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) <br> SIERRA CLUB, *and* SOUTH FLORIDA ) <br> WILDLANDS ASSOCIATION, ) <br> ) <br> *Plaintiffs,* ) <br> ) <br> *v.* ) <br> ) <br> BRIAN NESVIK, *in his official capacity* ) <br> *as Director of the United States Fish and* ) <br> *Wildlife Service*; LARRY WILLIAMS, *in* ) <br> *his official Capacity as State Program* ) <br> *Supervisor of the Florida Ecological* ) <br> *Services Office of the United States Fish* ) <br> *and Wildlife Service*; DOUG BURGUM, *in* ) <br> *his official capacity as Secretary of the* ) <br> *United States Department of the Interior*; ) <br> LT. GEN. WILLIAM H. GRAHAM, JR., *in* ) <br> *his official capacity as Chief of Engineers* ) <br> *and Commanding General of the United* ) <br> *States Army Corps of Engineers*; and COL. ) <br> BRANDON BOWMAN, *in his official* ) <br> *capacity as District Commander of the* ) <br> *Jacksonville District of the United States* ) <br> *Army Corps of Engineers,* ) <br> ) <br> *Defendants.* ) <br> _____ ) | Civ. No. 2:26-cv-01072 <br><br> **DECLARATORY RELIEF REQUESTED** <br><br> **PERMANENT INJUNCTIVE RELIEF REQUESTED** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.    Pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, Plaintiffs Center for Biological Diversity ("the Center"), Sierra Club, and South

1

Florida Wildlands Association ("SFWA") challenge the U.S. Fish and Wildlife Service's ("FWS") February 25, 2025 biological opinion ("BiOp"), and the U.S. Army Corps of Engineers' ("Army Corps") (collectively, "the agencies") affirmative actions taken in reliance on the BiOp, in connection with the Army Corps' issuance of a permit under Section 404 of the Clean Water Act ("CWA") to Tarpon Blue Silver King I, LLC d/b/a Collier Enterprises ("Proponent") for the Rural Lands West Project ("Project"), located in Collier County, Florida.

2. This case involves the highly imperiled Florida panther ("panther"), one of Florida's most iconic and endangered species. With fewer than 230 extant individuals, the panther is restricted to a single breeding population occupying less than five percent of its historic range. This remaining suitable habitat amounts to a mere fraction of what FWS maintains is necessary to support a viable population and ultimately recover the species.

3. The panther's only remaining habitat is in south Florida, a region that is experiencing rapid growth and development. Much of the development that threatens the panther and its habitat—including the Project at issue—is occurring within Lee, Hendry, and Collier Counties, which together are considered "a stronghold for the panther population." In addition to habitat loss and fragmentation from the projects themselves, urban and suburban development also brings new infrastructure, which further fragments panther habitat, isolates individual panthers, and increases the risk of vehicle collisions, a leading cause of panther mortality. As FWS's own assessments of the species'

2

long-term viability reveal, without swift action to curtail development in panther habitat, restore and expand suitable habitat, and address the grave effects of human encroachment on occupied habitat areas, extinction of the species may be unavoidable.

4.      Notwithstanding the dire status of the species, FWS determined in the BiOp that the Project's anticipated destruction of nearly 5,000 acres of panther habitat would not jeopardize the continued existence of the panther. The BiOp failed to acknowledge that the panther almost certainly faces jeopardy even *without* the Project, and failed meaningfully to analyze the additive impacts of the action to the panther's survival and recovery prospects in that context, as the ESA requires. Despite this and other obvious flaws in the BiOp (which have been identified by the public), the Army Corps subsequently relied on FWS's legally and factually deficient determinations in the BiOp when issuing the challenged Section 404 permit to the Proponent authorizing construction of the Project.

5.      For these reasons and those set forth below, FWS's BiOp, as well as the Army Corps' reliance on the BiOp to discharge its own substantive obligations under the ESA, violate the ESA, its implementing regulations, and the ESA's citizen suit provision. *See* 16 U.S.C. § 1540(g). In addition, the agencies have acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law" within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2). Accordingly, the Army Corps and FWS must be

3

immediately enjoined from authorizing any further activities in connection with the Section 404 permit for the Project until such authorizations can be brought into compliance with the ESA, and the agencies' decisions implementing such activities must be vacated and remanded for further decision-making consistent with the ESA and its regulations. 16 U.S.C. § 1540(g); 5 U.S.C. § 706.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 16 U.S.C. § 1540(g) (ESA citizen suit provision). Plaintiffs' claims arise under the APA, 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. §§ 1531-1544. Plaintiffs have exhausted their administrative remedies and have no other remedy at law.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and Local Rule 1.04 because "a substantial part of the events or omissions giving rise to the claim" occurred in Collier County, and a substantial part of the property that is the subject of this action (i.e., the Rural Lands West Project) is situated in this Collier County.

## PARTIES

8. Plaintiff Center for Biological Diversity is a 501(c)(3) non-profit corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United

States and the world, including protection of plant and animal species, from the impacts of climate change, wildfires, and human-caused habitat destruction. The Center has more than 101,000 members throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the Florida panther.

9.      Plaintiff Sierra Club is a national non-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Headquartered in Oakland, California, Sierra Club has sixty-seven chapters and more than 607,030 members across the nation. Sierra Club's concerns include the protection of wetlands and federally listed threatened and endangered species, including the Florida panther. Sierra Club brings this action on behalf of itself and its adversely affected members.

10.      Plaintiff South Florida Wildlands Association is a non-profit environmental organization incorporated in the State of Florida to protect the biodiversity and ecological integrity of the Greater Everglades. SFWA serves as a strong local voice advocating for the protection of the large swaths of undeveloped public and private lands outside of south Florida's urban

5

boundaries. For example, SFWA maintains an active social media presence and regularly shares information regarding the panther and its habitat, threats to the species, and calls to action to its over 156,000 followers. SFWA also offers educational talks at various community venues; engages communities and supporters through emailed action alerts, social media posts, and publishes interviews and articles in legacy media; and participates in local, state, and federal decisionmaking processes that may affect south Florida wildlife and their habitats. Since its inception in 2010, SFWA has advocated on behalf of Florida panthers and their habitat. It has provided oral testimony and letters during public comment periods on numerous development projects and other matters affecting the species. SFWA brings this action on its own behalf and on behalf of its adversely affected members.

11.     Plaintiffs' members live in and/or regularly visit south Florida to observe the panther and its habitat, including habitat within and around the Project's Action Area. Plaintiffs' members undertake various recreational and professional activities within such habitat, including hiking, fishing, camping, viewing and photographing scenery and wildlife (and signs of wildlife, such as panther tracks and scat), and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members have significant, concrete interests in the preservation and protection of panthers and their habitat in south and south-central Florida, and actively work to conserve the natural ecosystems.

6

12.     For instance, Matthew Schwartz—who is the executive director of SFWA and a member of the Center—first moved to south Florida in 1995 and was quicky drawn to the wilderness areas within Big Cypress National Preserve. Mr. Schwartz feels a deep connection to wilderness areas, and founded SFWA in 2010 to protect the incredible biodiversity and ecological systems found in the dwindling wildlife habitat areas in south Florida. Relevant here, Mr. Schwartz regularly visits panther habitat throughout south Florida to observe, photograph, study, and otherwise enjoy the panther, including such habitat within and around the Action Area in Collier and Lee Counties, and has long advocated for preserving and expanding panther habitat to ensure the species' survival and recovery into the future. Mr. Schwartz thus has demonstrated concrete recreational, aesthetic, and professional interests in the panther and its habitat. He last visited panther habitat in Collier County to engage in various recreational and professional activities in pursuit of those concrete interests (e.g., hiking, exploring panther habitat, and viewing panther and panther sign) in November 2025.

13.     Michael McGrath—who is a member and staff member of the Sierra Club—currently lives in Saint Petersburg, Florida. Mr. McGrath has concrete recreational, aesthetic, and professional interests in the panther and its habitat. For example, Mr. McGrath frequently organizes grassroots events that seek to build public support for protecting the panther and conserving its habitat. He also frequently visits the Florida Panther National Wildlife Refuge, which is near

the Project Area, to view panthers and their habitat. Similarly, Tom Mortenson—who is a member of the Sierra Club—has longstanding recreational and aesthetic interests in the panther and its habitat. Mr. Mortenson is well-known for his images of panthers—including individuals photographed within and around the Project Area—which are captured on game cameras. Mr. Mortenson shares his images to educate others about the panther and its behaviors, and to inspire others to care about this iconic species.

14.    Dave Griswold—who is a member of the Center—likewise has concrete recreational and aesthetic interests in the panther. For instance, Mr. Griswold enjoys looking for panthers and signs of panthers (e.g., tracks) while hiking, camping, and biking along Florida Trail; documenting panther sightings (tracks) on iNaturalist; volunteering with the Florida Trail Association to maintain the National Trail in Big Cypress National Preserve; and leading hikes during which he identifies panther sign for participants so they can gain an appreciation of this special species that lives in our wilderness. Thomas Trotta is also a member of the Center, and has concrete recreational and aesthetic interests in the panther and its habitat. Mr. Trotta regularly engages in volunteer activities that aim to protect this iconic species, such as serving as a board member and President of Friends on the Florida Panther Refuge for nine years during the 2010s. Mr. Trotta also enjoys looking for and photographing panthers with his wife and friends, and assists Florida state biologists in their panther tracking efforts by reviewing trail camera data. Finally, Ms. Conny Randolph—

who is a member of the Center—has multifaceted, concrete interests in the panther and its habitat. As a part-time professional wildlife photographer, the panther is chief among Ms. Randolph's sought-out subjects. Because this rare and elusive creature is a challenge to find, Ms. Randolph is always on the look-out for panther sign and considers it a "huge treat" to find paw prints, scratch marks, or even panther scat. Ms. Randolph frequently drives through the Project Area on her way to view panthers and panther habitat at the nearby Corkscrew Swamp Sanctuary.

15. Plaintiffs' staff and members—including Mr. Schwartz, Mr. McGrath, Mr. Mortenson, Mr. Griswold, Mr. Trotta, and Ms. Randolph—intend to, and have concrete plans to, continue enjoying occupied panther habitat in Collier County regularly and on an ongoing basis in the future. In particular, Mr. Schwartz plans to return to Collier County within the next two months. During this visit, Mr. Schwartz plans to engage in various recreational, scientific, and aesthetic activities, including (but not limited to): searching for, viewing, and photographing the panther or signs of the panther (such as tracks or scat); and hiking, observing, photographing, and enjoying panther habitat on public lands. Messrs. McGrath and Mortenson also plan to return to the Project Area to engage in a variety of recreational, scientific, and aesthetic activities, including viewing, photographing, and enjoying panthers and their habitat in the near future. Messrs. Griswold and Trotta likewise regularly visit panther habitat within Collier County, including habitat within the Project Area. Mr. Trotta in particular has

spent hundreds of hours within the Project Area and plans to return soon. Mr. Griswold intends to return to the habitat within the Project Area to view panthers later this spring. Ms. Randolph intends to visit the area to view panthers again this summer.

16.    The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of Plaintiffs and their members, including Mr. Schwartz, have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and the APA continue. The relief sought will redress Plaintiffs' and their members' injuries by: substantially reducing the threats to the panther's survival; ensuring that the panther's recovery prospects are not impaired or jeopardized by Defendants' actions; ensuring that the panther's distribution is not diminished; and ensuring that opportunities to observe and enjoy this species are not diminished, to the detriment of Plaintiffs, their members, and their collective interests in the panther and its habitat. The relief sought will also provide additional process under federal law that will bring the best available science to bear on Defendants' decisions, which likely will benefit the panther and its essential habitat of particular importance to Plaintiffs and their members.

17.    Defendant Brian Nesvik is the Director of FWS, an agency within the U.S. Department of the Interior, and is responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for

overseeing FWS's actions challenged in this lawsuit, and is sued in his official capacity.

18.     Defendant Larry Williams is the State Program Supervisor of the Florida Ecological Services Office within FWS, an agency within the U.S. Department of the Interior, and is directly responsible for the supervision, management, and control of the agency's activities in Florida. Accordingly, he is responsible for overseeing FWS's actions challenged in this lawsuit, and is sued in his official capacity.

19.     Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is ultimately responsible for overseeing the work of FWS, an agency within the Department of the Interior. He is sued in his official capacity.

20.     Defendant Lieutenant General William H. Graham, Jr. is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers, and is directly responsible overseeing the work of the Army Corps. He is sued in his official capacity.

21.     Colonel Brandon Bowman is the District Commander and District Engineer of the Jacksonville District of the U.S. Army Corps of Engineers, and is directly responsible for the supervision, management, and control of the district. Accordingly, he is responsible for overseeing the Army Corps' actions challenged in this lawsuit and is sued in his official capacity.

## STATUTORY BACKGROUND

### A.    Endangered Species Act

22.    Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. As such, the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

23.    The ESA defines "endangered species" as a, "species that is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1536(20). Pursuant to the ESA, FWS maintains a list of species that have been designated to be endangered or threatened (i.e., "listed"), and thus are protected by the statute. *See id.* § 1533.

24.    The ESA requires FWS to "develop and implement" recovery plans "for the conservation and survival of endangered species and threatened species listed pursuant to this section." *Id.* § 1533(f). A recovery plan must include: (1) "a description of such site-specific management actions" that are "necessary to achieve the plan's goal for the conservation and survival of the species" (i.e., actions that are necessary to recover the species to the point where protection under the ESA is no longer necessary); (2) "objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the list"; and (3) "estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." *Id.*

25.    Section 9 of the ESA makes it unlawful for any person to "take" an endangered or threatened species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The term "harm" is further defined by FWS regulations to encompass "habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. FWS's regulations define "harass[ment]" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal

13

behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.*

26. Section 7(a)(2) of the ESA requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation, before undertaking any action that may have direct or indirect effects on listed species, an action agency must engage in consultation with FWS in order to evaluate the impact of the proposed action. *See id.* FWS has defined the term "action" for the purposes of Section 7 broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03.

27. The purpose of consultation is to ensure that the action at issue "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy to a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Thus, during consultation, the action agency and FWS must consider, in evaluating the effects to the species, whether "the agency action will []

appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). The evaluation of the effects of the proposed action on listed species and their habitat during consultation must use "the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

28.     Consultation under Section 7(a)(2) may be "formal" or "informal" in nature. If the action agency finds that the proposed action "may affect" listed species or critical habitat by having any adverse effect that is not insignificant or discountable, then formal consultation is required. *See* 50 C.F.R. § 402.11. The result of a formal consultation is the preparation of a BiOp by FWS, which is a compilation and analysis of the best available scientific data on the status of the species and how it would be affected by the proposed action. When preparing a BiOp, FWS must: (1) "review all relevant information;" (2) "evaluate the current status of the listed species;" and (3) "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). As such, a BiOp must include a description of the proposed action, a review of the status of the species and its habitat, a discussion of the environmental baseline, and an analysis of the direct and indirect effects of the proposed action and the cumulative effects of reasonably certain future state, tribal, local, and private actions. *Id.*

29.     At the end of the formal consultation process, FWS issues either a no-jeopardy or a jeopardy BiOp. With a no-jeopardy BiOp, FWS determines that

15

the proposed action is not likely to jeopardize the continued existence of listed species. If, as part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written Incidental Take Statement ("ITS") specifying the "impact of such incidental taking on the species" and "any reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Although a numeric level of actual take is preferred (e.g., a specific number of animals killed, harmed, or harassed), FWS may occasionally use a "surrogate (e.g., similarly affected species or habitat or ecological conditions)" to express the acceptable amount of take where "it is not practical" to use a numerical limit. 50 C.F.R. § 402.14(i)(1)(i). However, a surrogate is only appropriate if (1) there is a "causal link between the surrogate and take of the listed species," and (2) the surrogate "sets a clear standard for determining when the level of anticipated take has been exceeded." *Id.* Take in excess of that authorized by the ITS violates the prohibition on take contained in Section 9 of the ESA. 16 U.S.C. § 1538.

30.    With a jeopardy BiOp, FWS determines that the proposed action will jeopardize the continued existence of listed species. In a jeopardy BiOp, FWS shall recommend to the action agency reasonable and prudent alternatives to the

16

proposed action that will avoid jeopardy to a listed species or adverse habitat modification, if they exist. *Id.* § 1536(b)(3)(A).

31.    Where a BiOp has been issued and "discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency is required to reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f the amount or extent of taking specified in the [ITS] is exceeded"; (2) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; (3) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered" in a prior consultation; or (4) "[i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a).

### B.    **Administrative Procedure Act**

32.    The APA, 5 U.S.C. §§ 701–706, provides for judicial review of final agency action.

33.    Under the APA, a reviewing court "shall" hold unlawful and set aside "agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an

17

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

34.    When reviewing agency action under the APA, a court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

**FACTUAL BACKGROUND**

I.    **THE FLORIDA PANTHER**

A.    **Habitat and Life-Cycle Needs**

35.    The Florida panther, the only puma population remaining east of the Mississippi River, is an iconic large feline that was first listed as endangered in 1967. *See* 32 Fed. Reg. 4001 (Mar. 11, 1967). Historically, panthers roamed the entire southeastern United States. However, today, the Florida panther has been restricted to a single breeding population of approximately 120 to 230 individuals occupying less than five percent of the species' historic range. This last remaining population is located south of the Caloosahatchee River. Recent population modeling indicates the Florida panther population peaked in 2016, after which

numbers have continued to decline. Panther experts recommend that genetic introgression may again be necessary to prevent inbreeding depression.

36.   Panthers are "wide ranging, secretive, and occur at low densities." Panthers therefore require large contiguous areas of suitable habitat to meet their life-cycle needs. This is particularly true for male panthers; while overlap among the home ranges of female panthers is extensive, overlap among the home ranges of male panthers is limited. Panther home-range size for both sexes is influenced by numerous factors, including habitat quality, prey density, and landscape configuration, and is "inversely related to habitat quality; the greater the extent of agricultural land and wetland habitats, the larger the home range, and the greater the extent of mixed hardwood forests and dry pine forests, the smaller the home range."

37.   Male panthers are polygynous, maintaining large home ranges that overlap with those of several adult females and their dependent kittens. Female panthers produce litters throughout the year, with the majority of births occurring between May and June. Litters generally consist of two or three kittens, which are weaned at approximately eight weeks. Juvenile panthers stay with their mothers for an average of fourteen months, after which they disperse to establish their own territories.

38.   Most panther dispersal occurs south of the Caloosahatchee River. While panthers are likely capable of crossing the relatively narrow Caloosahatchee River, it is thought that the cumulative effects of the river, State

Route 80, and incompatible land uses along the river have restricted panther distribution northward. Even if such dispersal were to occur, what little suitable panther habitat remains in south-central Florida (i.e., habitat north of the Caloosahatchee River) is widely scattered and fragmented, making the area largely unsuitable to support individual panthers in the long term, let alone viable panther populations. Major highway projects and ongoing commercial, residential, and agricultural development on both sides of the river continue to worsen habitat isolation and fragmentation.

## B.    The 2008 Recovery Plan

### i.    *Panther Habitat Zones*

39.    FWS last completed a Recovery Plan for the Florida panther in 2008. The Recovery Plan established three priority zones for the conservation of panther habitat: the Primary Zone; the Secondary Zone; and the Dispersal Zone.

40.    The Primary Zone is defined to include "lands *essential* to the long-term viability and persistence of the panther in the wild." It consists of 3,548 square miles, roughly seventy-three percent of which is publicly owned, and is the only zone that is currently occupied. According to the best available science, maintaining the total area and extent of existing home ranges and habitat functions within the Primary Zone is *essential* to the panther's survival. Hence, any proposed developments should result in a zero net loss of Primary Zone landscape function or carrying capacity.

41.     The Secondary Zone includes "lands contiguous with the Primary Zone, currently used by few panthers, but which could accommodate expansion of the panther population south of the Caloosahatchee River." This zone consists of 1,269 square miles, thirty-eight percent of which is publicly owned. Some areas of the Secondary Zone may require restoration to support panthers.

42.     Finally, the Dispersal Zone includes "the area which may facilitate future panther expansion north of the Caloosahatchee River." This zone consists of forty-four square miles, all of which are privately owned. Although panthers move through the Secondary and Dispersal Zones, no resident population in either area has been established.

ii.     *Major Threats*

43.     The Recovery Plan identified "[h]abitat loss, fragmentation, and degradation, and associated human disturbance" as the "greatest threats to panther survival and among the greatest threats to its recovery." These threats are unlikely to be mitigated in the future; in fact, they are expected to increase exponentially as Florida continues to experience rapid population growth, urban expansion, and climate change. Indeed, between 2000 and 2010, the human population in southwest Florida—where the breeding panther population is primarily located—increased by over forty-seven percent, rising from approximately 833,000 to over 1.2 million people. These same lands contain the entirety of the dwindling Primary and Secondary Zone panther habitat that remains today, providing a necessary prey base as well as mating and denning

21

opportunities for a wide-ranging predator that needs abundant space for its biological life-cycle functions. Not only does such rapid growth and development in south Florida threaten to fundamentally alter the quantity and quality of habitat that is essential to the panther's survival and recovery (assuming recovery is still possible), but such development inevitably exacerbates human disturbance and panther mortality through substantially increased traffic and other human-driven effects of development (e.g. habitat loss and fragmentation, spread of invasive species, decreased prey availability).

44.     The conversion of land for new commercial or residential developments presents a particularly acute threat. Panthers have large ranges, and are very sensitive to human disturbance. As urban sprawl and development shrink the amount of suitable habitat available, panthers are confined to ever-smaller patches. As habitat loss pushes individuals closer together and/or forces individuals to expand their ranges in search of requisite resources (e.g., prey, mates), the potential for interactions between conspecifics increases. Such interactions often lead to intraspecies aggression, a "[l]eading source[] of panther mortality" and a serious threat to the species' viability. Indeed, the 2008 Recovery Plan identified intraspecies aggression as the most common cause of male panther mortality.

45.     New residential and commercial developments bring with them new infrastructure, including roads and highways, which can have wide-ranging adverse impacts on panther populations, including habitat loss and

fragmentation, vehicle collisions, and habitat avoidance. Additionally, new and expanded roads and highways impede panther movement between habitat areas, ultimately isolating some areas of panther habitat and panther populations. Small, isolated panther populations, in turn, are subject to demographic and stochastic factors (e.g., skewed age-structure, low birth rates, and high death rates) that render them more vulnerable to variable environmental conditions and catastrophic events, thereby reducing the species' chances for survival and recovery. These risks are keenly felt in the Project's Action Area.[1]

46.    Between 1985 and 2003, more than 145 square miles of semi-natural and natural lands in Collier, Lee, and Hendry Counties ("a stronghold for the panther population") were lost to development.[2]

47.    Moreover, the "extensive developments planned in Collier County . . . will expand local road networks and extend the human/panther interface into primary panther habitat," increasing the risk of vehicle mortalities (among other impacts) to panthers. In fact, Immokalee Road (co-signed as County Road 846),

---

[1] The Action Area for the Project is defined to include all lands within a twenty-five-mile radius of the Project.

[2] Many of these projects required Section 7 consultation pursuant to the ESA. *See* Recovery Plan at 46-47. However, hundreds of other projects planned within the Project's action area are exempt from regulatory review because they do not require a federal license or permit to proceed. *See* BiOp at 31 (reporting that from 2020 through 2023, at least 156 projects within the Project's Action Area affecting over 4,600 acres of panther habitat were exempt from regulatory review). Indeed, FWS estimates that, for *every year* of the twenty-year permit, approximately 1,166.89 acres of panther habitat within the Action Area will be lost to development without any federal oversight. *Id.*

which abuts the Project, is specifically identified by the Recovery Plan as posing a serious mortality risk to panthers.

48.     Compounding the threats posed by habitat fragmentation, isolation, and vehicle collisions, human encroachment into panther habitat has been directly linked to the spread of diseases and parasites in panther populations. For example, feline leukemia virus ("FeLV") weakens the immune systems of infected felids, rendering them vulnerable to opportunistic infection. Although generally rare in wild felids, FeLV has been detected in the panther population and has been linked to several panther mortalities. The disease was likely introduced into the population by domestic or feral housecats, brought into close proximity to panther habitat by humans. The potential for the introduction and spread of novel diseases into the lone remaining panther population is particularly concerning; at present, there is no barrier that could prevent a disease from spreading through the entire population.

### iii.     *Recovery Criteria and Actions*

49.     The Recovery Plan discussed the panther's population dynamics and the requirements to maintain viability.[3] Based on the best scientific evidence available, the Recovery Plan (via a team of panther experts) established

---

[3] A population is considered "viable" when it has the "capacity to maintain itself without significant demographic or genetic manipulation for the foreseeable ecological future—usually centuries—with a certain, agreed on, degree of certitude." FWS considers the "minimum viable population" for a given species to be "the smallest isolated population" that has a ninety-five to ninety-nine percent "chance of remaining extant" for one hundred years, "despite the foreseeable effects of demographic, environmental and genetic stochasticity and natural catastrophes." This generally corresponds to a one percent chance of "true extinction" over a 100-year time frame.

recommendations for panther population size as it relates to persistence. Following these guidelines, populations of fewer than fifty individuals face a significant extinction risk in fewer than 100 years, while populations of sixty to seventy individuals are considered "barely viable" and will likely decline by twenty-five percent over 100 years. Populations of 80 to 100 individuals are "likely stable" over the next 100 years; however, such populations will exhibit declining genetic range are likely stable with a low probability of extinction for 100 years," but will exhibit "slowly declining genetic diversity and are vulnerable to habitat loss or environmental catastrophes." According to the Recovery Plan, only panther populations of greater than 240 individuals are truly stable—i.e., have "a high probability of persistence, low probability of extinction over 100 years, . . . abil[ity] to retain 90% of their heterozygosity (representation), and [ability to] tolerate some habitat loss or mild catastrophes."

50. For the Florida Panther to "recover" to the point at which it may be delisted, the Recovery Plan set forth two mandatory criteria (the "recovery criteria"): (1) the establishment of "[t]hree viable, self-sustaining populations of at least 240 individuals" that are "subsequently maintained for a minimum of twelve years"; and (2) the protection and maintenance of "[s]ufficient habitat quality, quantity, and spatial configuration to support these populations." Additionally, the "exchange of individuals and gene flow among subpopulations must be natural (i.e., not manipulated or managed)." According to the Recovery Plan, the establishment of three viable populations, each of at least 240 panthers,

25

would provide an "adequate margin of safety for full recovery," particularly with respect to potential environmental catastrophe and disease outbreaks.

51.    Applying the population guidelines to the panther's then-abundance of roughly 100 to 120 individuals, the Recovery Plan concluded that the current population size "is not sufficient to offset genetic drift in the long term." The Recovery Plan further warned that unless "the current condition, amount, and configuration of the occupied panther habitat" can be maintained, "the long-term viability of the panther is not secure." The observed inbreeding depression and loss of genetic variability, coupled with the "small size and high degree of isolation," renders the population "vulnerable to catastrophic events," including storm events and disease outbreaks.

52.    In the Recovery Plan, FWS concluded that "[a]t current population levels," the loss of even a single panther "may pose an added risk to the existing population." Compounding these problems, the Recovery Plan observed that there is insufficient suitable habitat in either south Florida or south-central Florida to sustain a viable panther population. Therefore, even if the panther population expanded to 240 individuals—i.e., the minimum abundance necessary for a "stable" and "viable" population—absent significant habitat restoration efforts in south and south-central Florida, there would be no place for them to go. Hence, to achieve the recovery criteria, habitat of sufficient quality, quantity, and spatial configuration must be maintained, expanded, and protected, particularly within the Primary Zone and adjacent habitat.

53.     In particular, the panther's future hinges upon the expansion of panther populations to south-central Florida and other areas within the species' historic range. To provide for the panther's long-term persistence, the best available science suggests that as much as sixty to seventy percent of the species' historic range must be restored and conserved—a dramatic increase for a species limited to a mere five percent of range. Yet, the suitable habitat that remains in south Florida occurs in widely scattered, relatively small patches fragmented by major highways and agricultural and urban development. Development pressures are expected to further encroach upon these limited areas as human population growth continues, which in turn, will decrease the opportunity for panther expansion north of the Caloosahatchee River. Accordingly, to achieve the species' ultimate recovery, human intervention will likely be necessary to restore significant amounts of habitat, facilitate population expansion, and establish self-sustaining populations north of the Caloosahatchee River.

54.     The Recovery Plan explained that the removal of even one panther from the breeding population—whether from intraspecies aggression, vehicle collision, disease, or otherwise—could endanger the survival and recovery of the species. Indeed, "[a]t current population levels," the loss of even a single panther "may pose an added risk to the existing population" due to the small population size and genetic drift. Consequently, actions that contribute to the serious injury or mortality of individuals by exacerbating the effects of "habitat loss, fragmentation, and degradation, and associated human disturbance"—i.e., the

27

"greatest threats to panther survival . . . [and] recovery"—place the species in greater peril, and push recovery farther out of reach.

55. To achieve the recovery criteria, the Recovery Plan emphasized the importance of rigorous regulatory review for new development and infrastructure projects. According to the Recovery Plan, ESA consultation allows FWS and action agencies to examine the risks of proposed development projects, identify opportunities to mitigate the adverse effects, and implement science-based measures to examine and offset the impacts of development projects.

56. The Recovery Plan also recommended specific "recovery actions" to assist in the implementation of the Recovery Plan and improve the chances of achieving recovery. For instance, the recovery actions recommended specific measures to "prevent and minimize the negative impacts of roads to panther habitat," such as improved planning and permitting processes, modification of existing roads, and requirements for the reinitiation of consultation in response to mortalities. To guide all federal agencies in implementing the recovery actions, the Recovery Plan also provided an implementation schedule, which directed FWS to work with action agencies (including the Army Corps) to "track permits, *especially incidental take and compensation received*, issued through Federal and State regulatory programs," and underscored the importance of reducing panther vehicle collisions by, e.g., "ensur[ing] that panther habitat needs are incorporated in the planning of new roads and road expansion projects," and

28

"evaluat[ing] and implement[ing] other mechanisms to prevent mortalities on roads."

C.     **Continuing Decline of the Species**

57.     Despite FWS's evidence-backed conclusion from nearly two decades ago that "range expansion and reintroduction of additional populations are recognized as essential for panther recovery," the agency has failed to make any progress towards achieving the recovery criteria. Meanwhile, the primary threats to the panther have only increased since the issuance of the Recovery Plan.

58.     In particular, new developments and expanded infrastructure have substantially worsened habitat isolation and fragmentation. Because much of the land upon which the panther relies for its habitat is in private ownership, it is essential that land managers take the needs of the panther into account when approving projects, particularly where the projects fall under federal regulatory review. In particular, in accordance with the Recovery Plan, any projects within the Primary Zone should result in a zero net loss of panther habitat functionality and spatial extent. Habitat losses in other habitat zones should likewise be carefully managed to ensure that development projects do not worsen the panther's highly imperiled status. However, in the sixteen-year period between the issuance of the Recovery Plan and the BiOp (i.e., 2009 to 2025), FWS has issued no-jeopardy BiOps for large development projects within the Primary, Secondary, and Dispersal Zones that have effectively condoned the destruction and permanent loss of *over 29,000 acres* of panther habitat. This does not

29

include the significant amount of acreage that is lost—and that was specifically lost during that same time period—to development without any federal regulatory review

59.     Urban and suburban development projects within panther habitat have also led to an exponential increase in panther mortality from vehicle collisions. Indeed, vehicle collisions are now the leading cause of direct mortality for panthers. According to FWS's own data, vehicle collisions caused 62.3% of all panther deaths between 1972-2019. In 2024, twenty-nine panthers were killed by vehicle collisions, the highest number of vehicle mortalities in nearly ten years. In 2025, at least seventeen panthers were struck and killed by vehicles, including four female adults and two kittens. On average, over the past five years, twenty-one panthers have been killed per year by vehicle collisions, meaning that vehicle collisions are responsible for the annual mortality of between nine and eighteen percent of all remaining adult panthers.

60.     Climate change and sea level rise compound the myriad threats to the panther. Florida is extremely susceptible to the effects of climate-change-driven sea level rise due to its low elevation, high water table, and coastal geography. FWS predicts that sea levels around south Florida could rise as much as 0.5 meters by 2040, and by as much as 1 meter by 2070. According to the agency, a 0.5-meter rise in sea levels by 2040 would result in the loss of eleven percent (i.e., 973 km$^2$) of "Functional Zone [panther] habitats along the southern fringe of the Big Cypress and Long Pine Key regions."

61. When the additive, substantial loss of lost panther habitat is considered in conjunction with the impacts of urban sprawl and future development projects that threaten to significantly reduce the spatial extent and functionality of suitable habitat and movement corridors, the panther's ability to disperse out of South Florida in the future is considered to be "compromise[d]." With limited or no dispersal capability, the panther population would remain small and likely shrink due to the effects of inbreeding depression, genetic drift, habitat loss, and human disturbance. A smaller panther population would become less viable in the long-term, decreasing the species' overall resiliency, redundancy, and representation over time.

## II.    RURAL LANDS WEST PROJECT

### A.    Brief Project Description

62. The Project is a mixed-use residential and commercial development consisting of approximately 10,264.63 acres. Construction of the Project will proceed over the next fifteen to twenty years.

63. Panthers occupy the Project area, which will encompass approximately 10,174.76 acres of habitat within the Primary and Secondary Zones. Highly intensive land clearing and construction activities will result in the permanent loss of 4,909.1 acres of habitat. Of these, 3,709.07 acres are in the Primary Zone and 1,200.03 acres are in the Secondary Zone. The Project incorporates the conservation and restoration of 5,241.6 acres of on-site upland and wetland habitat. According to FWS, the Proponent "used [FWS's] Panther

31

Habitat Assessment Methodology to determine the amount of panther habitat units (PHUs) needed to compensate for the panther habitat lost on the Project site." Based on this methodology, FWS determined that "the PHUs provided by the conservation and restoration of the onsite and offsite preservation areas adequately compensate for the habitat lost to development and any resulting harm to panthers."

64.    The Proponent is also required to provide funding on a per-acre basis to the Paul J. Marinelli Fund or to the Fish and Wildlife Foundation of Florida Fund, and is further required to include transfer fee provisions in the deeds for each residential unit that require contributions to the Paul J. Marinelli Fund upon each sale and/or re-sale. Finally, the Proponent must "construct or fund the construction of five wildlife crossings within the geographic region" of the Project, and provide contributions to Collier County earmarked for roadway funding.

**B.    Project Consultation History**

65.    The construction (and subsequent implementation) of the Project will have severe, adverse impacts on the panther and its habitat. To assess those effects, on June 25, 2024, the Army Corps requested formal consultation with FWS under the ESA. On January 17, 2025, FWS issued the BiOp for the Project, which concluded that the Project would not jeopardize the panther's survival or recovery prospects.

32

66.     Despite the BiOp's ultimate no-jeopardy conclusion, FWS explained the extremely precarious situation facing the panther. For example, the BiOp conceded that "the effects to the panther due to habitat loss associated with these lands [i.e., within the Action Area] . . . may increase as development continues to occur in the future," and further, that habitat loss and fragmentation due to development "*could* threaten the survival and recovery of the species." The BiOp thus acknowledged that preventing further habitat fragmentation—i.e., "[t]he breaking up of a habitat into unconnected patches interspersed with other habitat which may not be habitable by" the panther—"is a central underpinning" of the focus of panther conservation, and further, that for the species to persist, "contiguous habitat and protected habitat corridors . . . throughout the panther's historic range" must be maintained. Indeed, to provide for the panther's "long-term persistence," as much as sixty to seventy percent of the species' historic range must be restored and conserved—a dramatic increase for a species limited to a mere five percent of its historic range. The BiOp nevertheless concluded that the loss of nearly 5,000 acres of occupied habitat does not threaten the panther's survival or recovery.

67.     The BiOp explained that the primary effects to panthers would stem from the loss of nearly 5,000 acres of habitat currently occupied by the panther. Yet, the BiOp downplayed the effects of this loss—including the effects of the loss of habitat within the all-important Primary Zone—by focusing solely on the *quantity* of habitat lost (as opposed to the *quality* of the occupied habitat that

33

will be destroyed) to support its assertion that the Project would only "reduce carrying capacity in [the Action Area] for between 0.27 and 0.8 panthers." The BiOp thus concluded that the Project would "harm" no more than two panthers "by this loss in habitat carrying capacity and a potential increase in intraspecific aggression." This harm is expected to be lethal. Yet, the BiOp did not examine the impacts to the panther population from the loss of as many as two individuals, despite FWS's acknowledgement that the loss of a single breeding panther threatens the species' viability.

68.     The BiOp did not examine the impacts of the Project within the overall context of ongoing habitat loss suffered by the species. Indeed, since the issuance of the Recovery Plan, FWS has issued no-jeopardy BiOps for large development projects within the Primary, Secondary, and Dispersal Zones that have effectively condoned the destruction and permanent loss of *over 29,000 acres* of panther habitat. And this trend shows no sign of abating; less than a month ago, the Collier County Planning Commission unanimously approved Corkscrew Grove East, a development project near the Project Area that contains occupied habitat near the Florida Panther National Wildlife Refuge. Corkscrew Grove East will occupy 1,400 acres, many of which serve as vital secondary habitat that promotes habitat connectivity and is therefore essential to the species' survival and recovery. However, the BiOp narrowly confined its review to the ostensibly "minor" loss of the habitat to be destroyed by the Project, ignoring both the importance of *this* habitat to the panther's survival and recovery, and the

34

impacts to the species as habitat losses to development project continue to chip away what little suitable habitat remains. Instead, as has been FWS's consistent practice in the context of the panther, the BiOp downplayed the permanent loss of *thousands* of acres of suitable, occupied habitat—including habitat within the all-important Primary Zone—and ignored the collective effects of habitat loss that effectively confine panther populations to shrinking patches that are increasingly isolated and fragmented.

69.     The BiOp acknowledged that by destroying habitat and thereby reducing up to two panther's territory size, the Project may "increase the potential for" interspecies aggression, but largely dismissed such effects, insisting that FWS did not "anticipate" any "measurable increase" in the "potential for intraspecies aggression" because the Project "is only expected to support a portion of a panther's territory." At the same time, the BiOp conceded that FWS "currently do[es] not have a method to estimate the future number of panther mortalities in the action area resulting from intraspecific aggression due to habitat lost." The BiOp did not explain how the loss of nearly 5,000 acres of occupied habitat can be squared with either the best available science demanding "no net loss" of panther habitat function, or the Recovery Plan's goals, including its stated objective of protecting and restoring sufficient habitat to support three populations of 240 individuals. Nor did the BiOp consider whether the panther can withstand the additional harms that it conceded *will occur* as a result of the agencies' issuance of the Section 404 permit.

70.     The BiOp acknowledged that increases in traffic associated with increased human activity in the Action Area due to the Project presented "a prominent risk" to the species. Yet, the BiOp insisted that FWS was "unable to describe, with any certainty, how the project would alter (increase or decrease) the likelihood of motor vehicle strikes regardless of any traffic changes expected from the Project." Instead, breaking from its forty-five-year practice of considering the likelihood of motor vehicle collisions as an indirect effect of increased human activity, the BiOp merely mentioned "general traffic impacts to panther[s]" in its discussion of the "environmental baseline or cumulative effects." Indeed, prior to 2022, FWS assessed the indirect effects of panther mortality due to vehicle collisions using a population viability analysis ("PVA"), which in turn incorporated outputs from the "Future Roadkill Estimation Method" ("FREM"). FWS's own commissioned evaluation of the FREM by the U.S. Geological Survey confirmed that "[u]ntil a more elaborate model that accounts for uncertainty becomes available," the FREM was a "reasonable" methodology to predict the indirect effects of vehicle collisions on the panther population. Yet, in the BiOp, FWS departed from this longstanding practice without meaningful explanation.

71.     The BiOp did not meaningfully discuss the other serious impacts stemming from new and expanded infrastructure (and concomitant increases in traffic), including habitat fragmentation, the isolation of populations and individuals as habitat areas are bisected by roadways that form barriers to

36

panther dispersal, and decreased prey availability and reproductive success. These impacts, while less-than-lethal, still amount to "harm" and "harassment," as those terms are defined by FWS's regulations (i.e., "non-lethal take"). Yet, the BiOp never examined them, leading to a drastic underestimation of the "take" likely to occur from the Project, as well as of impacts on the species' recovery.

72.     The BiOp likewise gave short shrift to other known threats to the panther, including disease transmission, climate change, and increased development pressure from projects on private lands. With respect to disease transmission, the BiOp acknowledged that FeLV can be transmitted to panthers by domestic cats. However, aside from requiring the Proponent to "ensure" that future residents are "informed that vaccinating cats for [FeLV] can prevent disease transmission," the BiOp did not meaningfully discuss the Project's effects on FeLV infection rates within the panther population. This is particularly concerning, as the introduction and spread of FeLV and other diseases (e.g., feline immunodeficiency virus, opportunistic infections) present a significant (and growing) threat to the panther. Indeed, as the Recovery Plan explained, because the panther is confined to a single breeding population, "[s]hould a virulent pathogen enter the population, there is no absolute barrier in south Florida that could prevent such a disease from impacting the entire population."

73.     With respect to the effects of climate change, although the BiOp acknowledged that the cumulative effects of climate change (e.g., sea level rise and severe storms) could further reduce the extent of suitable panther habitat in

south Florida, it did not mention climate change *at all* in its jeopardy analysis. In the 2020 Species Status Assessment ("2020 SSA"), FWS reported its view that current evidence demonstrates that the foreseeable "rise in sea level of 0.5 m[eters] by 2040 would result in the loss of 973 km2 ([eleven] percent) of" existing panther habitat, which will only exacerbate the effects of the ongoing and reasonably foreseeable future habitat loss resulting from commercial and residential development. According to the agency, such a significant loss of suitable panther habitat alone "could affect the viability of current and future panther populations."

74.    The Recovery Plan likewise acknowledged FWS's position that habitat loss due to sea level rise could "compromise the ability of panthers to disperse out of South Florida in the future," impeding the species' ability to meet the recovery criteria, which notably require that the "exchange of individuals and gene flow among subpopulations [] be natural (i.e., not manipulated or managed)." Yet, the BiOp's discussion of the Project's effects combined with cumulative effects omits any mention of the threats posed by sea level rise. Instead, in a reversal from its detailed discussion of the effects of climate change on the panther and its habitat in the SSA—which included the "develop[ment] [of] models to calculate the potential for panther habitat loss due to the combined effects of future development and [sea level rise]"—the BiOp generically insisted that "[i]t is difficult to estimate, with any degree of precision, which species will be affected by climate change or exactly how they will be affected."

38

75.     As to the cumulative impacts of development on private lands, the BiOp predicted that over the twenty-year anticipated Project buildout, approximately 27,000 acres of non-urban private lands in the Action Area (including those lost to the Project) would be lost to development projects, which constitutes three percent of non-urban private lands at risk of development within the Primary and Secondary Zones. Indeed, within the last month, the Collier County Planning Commission unanimously approved Corkscrew Grove East, a 1,400-acre project that will destroy vital occupied secondary habitat near the Florida Panther National Wildlife Refuge. However, the BiOp did not meaningfully examine the cumulative impacts of such non-federal development projects on the panther's survival and recovery, either within the Action Area or across the species' range.

76.     In particular, the BiOp omitted any mention of the fact that FWS had determined only a month earlier that development projects in neighboring Lee County were likely to destroy approximately *eighteen percent* of non-urban private lands within the Primary and Secondary Zones (i.e., 156,960 acres) by 2045. Due to this major omission, the BiOp failed to account in any coherent manner for the reasonably foreseeable cumulative effects of the ongoing and foreseeable future development of privately-owned lands on the suitability and extent of the panther's remaining habitat and the habitat's ability to sustain and expand a panther population that comports with the recovery criteria. Nor did the BiOp consider the impacts of such development on the species in light of the

39

reasonably certain, permanent loss of a substantial amount of existing panther habitat due to the effects of climate change. Instead, without any analysis, the BiOp suggested that the Project may actually alleviate some of the development pressures by "reduc[ing]" the "likelihood that smaller, non-Federally reviewed actions will be needed to meet the commercial and residential needs of the rapidly growing human population in this area."

77.    The BiOp concluded that the Project, in addition to the baseline condition of the species, will not jeopardize the continued existence of the panther. The BiOp offered seven justifications for its determination: (1) the Project would not result in lethal take; (2) the ostensibly "minor" loss of 4,909.1 acres of habitat due to the Project would not "substantially affect the range-wide population size of th[e] species" because "many thousands of acres of panther habitat remain in Florida"; (3) no more than two panthers would be affected "via intraspecies aggression"; (4) the effects of the Project would be "minimized" by the restoration of  5,241.6 acres of on-site upland and wetland habitat that (according to the BiOp) would otherwise not occur in the absence of the Project; (5) the Action Area is "not crucial to the anticipated range expansion," notwithstanding the importance of preserving *all existing* habitat to the species' survival and recovery; (6) any potential increases in vehicle mortality would be "minimized" through wildlife crossings and fencing; and (7) FWS promised to "take steps necessary to reduce" traffic-related mortality if future increases in such mortality "can be attributed to the Project."

78.     The BiOp did not acknowledge that in the seventeen years since FWS published its Recovery Plan, the species has made no progress towards recovery, and, in many ways, has severely regressed. Nor did the BiOp consider (let alone determine) whether the baseline condition of the panther across its limited range or within the Action Area is currently jeopardized, prior to the construction and operation of the Project that will only appreciably worsen the species' condition at every scale. Nor did FWS rigorously analyze whether the impacts of the Project (including impacts largely ignored by the BiOp, such as disease transmission) along with cumulative effects (including the foreseeable effects of sea level rise), when added to the panther's highly degraded baseline condition, will appreciably reduce the species' survival or recovery prospects.

79.     The BiOp made no attempt to reconcile its no-jeopardy conclusion (which, by definition, includes the conclusion that the proposed action will not impair the panther's recovery) with the best available science stating that "unless we are able to safeguard the current condition, amount, and configuration of the *occupied* panther habitat, the long-term viability of the panther is not secure." Indeed, the BiOp largely ignores the paramount importance to the ailing panther's long-term viability of protecting and restoring every acre of occupied habitat, and expanding any suitable habitat that is immediately adjacent to occupied areas.

80.     The BiOp expanded on two of FWS's rationales for its no-jeopardy conclusion: i.e., the loss of the 5,000 acres at issue will not jeopardize the panther

because many acres of habitat remain elsewhere; and vehicle mortalities will be minimized by certain mitigation measures. The BiOp *conceded* that "collectively over time," both the effects of habitat loss and of vehicle-related mortality "*could* threaten the survival and recovery of th[e] [panther]." But rather than determine, as it must, *when* that jeopardy threshold would be crossed—or indeed, whether it already has been crossed in light of the panther's rapidly deteriorating condition—the BiOp kicked the proverbial can down the road, stating only that FWS "will continue to monitor the effects" of habitat loss and motor vehicle-related injuries and mortalities on the species. The BiOp did not elaborate on what sort of "monitor[ing]" FWS would be conducting with regard to either habitat loss or vehicle collisions. Nor did the BiOp explain the metrics that such monitoring would entail, let alone at what point (using objective monitoring metrics) the panther's recovery and survival would be jeopardized by habitat loss or vehicle mortality.

81.     Central to the BiOp's no-jeopardy finding was the BiOp's conclusion that the conservation and restoration of 5,241.6 acres of on-site upland and wetland habitat—as calculated using FWS's Panther Habitat Assessment Methodology—would adequately compensate for the amount of lost habitat. However, that methodology has been roundly criticized by experts for its reliance on outdated assumptions regarding the amount of panther habitat remaining, panther density, the relative values of Primary and Secondary Zones, and the panther population goal inherent in the methodology. In particular, the

methodology is designed to preserve sufficient habitat to support a population of only ninety panthers, which is far short of the three populations of at least 240 individuals that the Recovery Plan determined are necessary to ensure species viability and is far below the current population size.

82.    Additionally, FWS has not updated the acres of "at risk" and "conserved lands" in the methodology, which are considered by the best available science to be "critical to the calculation of compensation ratios" relied upon by the methodology to calculate PHUs since 2003. Nor has FWS updated the panther density used in the calculation, which the best available science indicates is three to five times higher than that used in the methodology. Moreover, although recent habitat modeling reveals that lands outside of the Primary Zone—and even lands within the Primary Zone itself—are of little value to support a breeding population of panthers, the methodology assigns lands outside of the Primary Zone high equivalency rates (i.e., multipliers). In so doing, the methodology greatly overestimates the quantity and quality of land available for use by panthers in those areas. The BiOp did not respond to these critiques.

83.    The BiOp also failed to acknowledge that the Panther Habitat Assessment Methodology ignores the Recovery Plan's call for "no net habitat loss." In other words, the Panther Habitat Assessment Methodology assumed that a portion of the remaining privately-owned habitat may be destroyed without threatening the viability of the species as long as the rest of the privately-owned habitat is preserved. The Panther Habitat Assessment Methodology is

therefore predicated on a presumption that flies in the face of FWS's own Recovery Plan: that net habitat loss is permissible without compromising species viability. The BiOp did not grapple with the inherent contradictions between the Panther Habitat Assessment Methodology and FWS's own conclusions in the Recovery Plan, which were rendered after considering the best available scientific evidence on the species, regarding the requirements for species viability.

84.    With respect to the conservation of on-site habitat, the BiOp failed to discuss the fact that the conservation value of the conserved areas is significantly diminished in light of the habitat's very close proximity to the Project and its infrastructure, which, in turn, decreases the quality of panther habitat within the Action Area. Indeed, many of the designated "conservation areas" directly abut the Project and are bisected by roadways. Consequently, the on-site habitat, despite being "conserved" for the panther, will pose significant risks to the species, including by providing only fragmented habitat that panthers are likely to avoid due to human encroachment and disturbance, isolating individual panthers, increasing traffic-related injury and mortality, and providing a vector for the introduction and spread of diseases like FeLV. The BiOp's key assumption that the conservation areas will "minimize" and/or "mitigate" the Project's impacts on the panther is therefore contradicted by the best available science suggesting that the proximity of those conservation areas to the Project and its accompanying infrastructure will only reduce the quality of habitat and thus further impede the panther's survival and recovery.

85.    The BiOp attached an ITS authorizing the incidental take of panthers during the course of Project construction. The ITS asserted that increased noise and human activity during construction "may increase disturbance to panthers in the Project vicinity," causing panthers to "adjust their territories to avoid the disturbance." To quantify the effects of habitat loss, the ITS "considered the reduction of panther habitat carrying capacity" caused by the Project. Noting that the loss of 4,909.1 acres of habitat in the Primary and Secondary Zones "approximates the loss of habitat carrying capacity for between 0.27 and 0.8 panthers," the ITS concluded that "no more than two" panthers will "be harmed by th[e] loss in habitat" and "potential increase in intraspecific aggression." The ITS thus authorized the lethal take of up to two panthers by Project activities.

86.    The ITS, however, did not provide any coherent method or mechanism to monitor whether or when the take of a panther has occurred, let alone any method for determining whether future intraspecific aggression mortalities in or near the Project area are attributable to the Project. To the contrary, FWS's position as articulated in the BiOp was that there is *no way* to determine whether a particular panther mortality (or non-lethal take) from intraspecies aggression is attributable to the effects of the Project. Nor did the ITS include any mechanism to monitor or mitigate the impacts of take from vehicle collisions, which the BiOp not only conceded is a leading source of panther mortality in the Action Area, but also acknowledged could be increased by the construction and operation of the Project.

45

87. The BiOp acknowledged that the Project will result in increased traffic that may result in lethal and non-lethal take of the panther. However, the ITS did not incorporate any traffic-related mitigation measures into enforceable conservation measures, mitigation measures, or reinitiation triggers. Instead, the BiOp committed to "monitor[ing] the panther population and investigat[ing] panther vehicle strikes," and proffered a list of vague "steps" that FWS would "consider" to "reduce" traffic-related mortality, but *only if* such mortality could be "attributed" to the Project. The ITS did not explain how FWS would determine the existence of a causal relationship, particularly in light of its earlier assertion in the BiOp that "future [panther vehicle mortality] cannot be attributed to the [Project]." The generic promise to "monitor" vehicle mortality is therefore an empty gesture, as the agency monitors for an effect it admits it cannot measure.

88. Neither the BiOp nor the ITS provided a numerical trigger or any method to ascertain whether a vehicle collision in the Action Area is "attributable" to the Project. To the contrary, FWS's current position, as articulated in the BiOp, is that "future [panther vehicle mortality] cannot be attributed to the [Project]." Worse, in the event that FWS were able to attribute particular vehicle mortalities to the Project, neither the BiOp nor the ITS provided any defined adaptive management process that would require FWS, the Army Corps, or the Proponent to implement required mitigation measures or achieve quantified objectives even if panther vehicle mortalities increased two-, three-, or even tenfold after Project construction. In fact, nothing in FWS's BiOp

46

required that any actions ever be taken in response to even exponential increases in vehicle mortalities in the Action Area. The generic promise to "monitor" vehicle mortality was therefore an empty gesture; the BiOp merely committed FWS to monitor for an effect the agency insisted it cannot measure.

## III.   **PLAINTIFFS' JANUARY 20, 2026 NOTICE OF INTENT**

89.    On the basis of the BiOp, the Army Corps issued a Section 404 permit to the Proponent allowing the filling of wetlands within the Project area and effectively authorizing Project construction that is actively destroying thousands of acres of panther habitat and in so doing, harming, harassing, and otherwise "taking" the panther as that term is defined under the ESA.

90.    On January 20, 2026, Plaintiffs submitted a detailed notice of intent to sue the agencies for violations of the ESA and its implementing regulations. *See* 16 U.S.C. § 1540(g)(2) (requiring Plaintiffs to notify all Defendants of the violations of the ESA and its implementing regulations that are the subject of this Complaint at least sixty days prior to filing suit).[4] Plaintiffs' notice detailed myriad legal violations in connection with the BiOp. For example, Plaintiffs notified Defendants, *inter alia*, that the agencies' issuance of the Section 404 permit violated the ESA for several reasons, including but not limited to Defendants' failures to: (1) determine whether the panther's baseline status is so

---

[4] Plaintiffs' notice of intent is attached for the Court's convenience and incorporated by reference. *See* Ex. 1. Plaintiffs' notice of intent included voluminous attachments, including previous BiOps, scientific studies, and additional data from FWS and the State of Florida that are part of the administrative record.

degraded as to constitute baseline jeopardy; (2) examine "whether the proposed action will jeopardize the species' survival or recovery prospects"; (3) utilize the best available science when formulating the BiOp's conclusions regarding the proposed action's effects on the panther and its habitat; (4) specify mitigation measures that are sufficiently clear and definite and that address threats to the species in a way that satisfies the jeopardy standard; and (5) include an ITS that sets a clear standard for determining when the authorized level of take has been exceeded.

91.    As of the date this Complaint was filed, neither the agencies nor the Proponent have responded substantively to Plaintiffs' notice of intent or taken action to address the identified violations.

92.    On information and belief, through the activities authorized pursuant to the BiOp and Section 404 permit, the agencies are allowing construction of the Project to proceed without any lawful BiOp in place that contains sufficient terms and conditions to avoid jeopardizing the panther. As a result, the BiOp does not shield the Corps from liability for unauthorized take.

## CLAIMS FOR RELIEF

### Claim 1 – FWS's Violations of Section 7(a)(2) of the ESA and APA

93.    Plaintiffs hereby incorporate paragraphs 1-92 by reference.

94.    By determining that the Project will not jeopardize the panther's survival or recovery prospects, FWS violated Section 7(a)(2) of the ESA, its

implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

95.    In issuing the BiOp—including its conclusions that the proposed action will not jeopardize the panther's survival or recovery prospects—FWS failed to rely on the best available scientific evidence, and thus violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

96.    By failing to consider (let alone determine) whether the baseline condition of the panther across its range and in the Action Area is currently jeopardized prior to the implementation of the proposed action that will only worsen its condition at every scale, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

97.    By failing to address or explain major inconsistencies between FWS's no-jeopardy conclusion in the BiOp and FWS's own findings in its 2008 Recovery Plan and/or 2020 SSA regarding the species' low viability in the long term due to precisely the kinds of development actions and significant habitat loss at issue, the objectives of the species' management, and the actions necessary to recover the species to the point that listing is no longer necessary, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

98.    By failing to meaningfully identify, evaluate, and incorporate the effects of the action on the panther into its jeopardy analysis, including but not limited to the cumulative effects of climate change, habitat loss, and disease spread, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

99.    By relying on monitoring and mitigation measures that are vague, uncertain to occur, and fail to meaningfully address the threats to the panther, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

100.    By relying on an arbitrary surrogate to specify the amount of incidental take authorized by the BiOp—i.e., a trigger that authorizes a level of take that is co-extensive with the Project and that FWS concedes cannot be monitored—and failing to specify measures that would effectively minimize take, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

### Claim 2 – Army Corps' Violations of Section 7(a)(2) of the ESA

101.    Petitioners hereby incorporate paragraphs 1-92 by reference.

102.    By issuing a Section 404 permit to the Proponent that effectively authorizes Project construction, the Army Corps has failed to ensure that its actions will not jeopardize the panther's survival or recovery, in violation of Section 7(a)(2) of the ESA and its implementing regulations.

103.    To the extent the Army Corps relies on FWS's BiOp, that consultation document is fatally flawed for the reasons explained herein and cannot and does not relieve the Army Corps of its independent duties to avoid jeopardizing the panther. Especially because the Army Corps was informed of myriad, obvious flaws in the BiOp, the Army Corps' reliance on the BiOp to issue a Section 404 permit to the Proponent has resulted in the Army Corps' ongoing violations of Section 7(a)(2) of the ESA and its implementing regulations.

### Claim 3 – Army Corps' Violations of Section 9 of the ESA

104.    Petitioners hereby incorporate paragraphs 1-92 by reference.

105.    By issuing a Section 404 permit to the Proponent effectively authorizing the Project without a legally sufficient BiOp or ITS in place, and because the level of take is reasonably likely to exceed the amount of take authorized by the ITS contained in the BiOp, the Army Corps is in ongoing violation of Section 9 of the ESA and its implementing regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

1.    Declaring that Defendants have violated the ESA and the APA;

2.    Setting aside the BiOp and the Section 404 permit that relies upon the unlawful BiOp, and ordering the Army Corps and FWS to reinitiate formal consultation under Section 7(a)(2) of the ESA to address all of the impacts of the

Army Corps' actions on the Florida panther prior to authorizing any further Project activities;

3. Remanding the BiOp to Defendants for further decisionmaking pursuant to Section 7(a)(2) of the ESA;

4. Enjoining the Army Corps from approving or otherwise taking action pursuant to any Section 404 permit for the Project until Defendants have complied with their obligations under the ESA, including by reinitiating and completing a lawful formal consultation process under Section 7(a)(2);

5. Awarding Plaintiffs their attorneys' fees and costs in this action; and

6. Granting Plaintiffs any further relief as the Court may deem just and proper.

Respectfully submitted this 7th day of April, 2026,

/s/Elizabeth L. Lewis
Elizabeth L. Lewis, Lead Counsel
    (motion for special admission
    forthcoming)
DC Bar No. 229702 (in good
    standing)
Phone: (202) 618-1007
lizzie@eubankslegal.com

William S. Eubanks II (motion for
    special admission forthcoming)
DC Bar No. 987036 (in good
    standing)
Phone: (970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

*Counsel for Center for Biological
    Diversity, Sierra Club, and South
    Florida Wildlands Ass'n*

*/s/ Elise Pautler Bennett*
Elise Pautler Bennett
Florida Bar No. 106573
Phone: (727) 755-6950
ebennett@biologicaldiversity.org

Jason Alexander Totoiu
Florida Bar No. 871931
Phone: (561) 568-6740
jtotoiu@biologicaldiversity.org

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731

*Counsel for Center for Biological
    Diversity*